UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AMANDA DANTONI and CHRISTOPHER CARROLL on behalf of themselves and all others similarly situated, | CASE NO:<br><br>SECTION |
| Plaintiffs, | |
| v. | |
| FCA US LLC f/k/a CHRYSLER GROUP, LLC, a Delaware limited liability company, and GRAMMER INDUSTRIES, INC., a South Carolina corporation, | CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| Defendants | |

## <u>CLASS ACTION COMPLAINT FOR DAMAGES</u>

Plaintiffs, Amanda Dantoni and Christopher Carroll file this class action complaint on behalf of themselves and all other similarly situated against Defendants FCA US LLC f/k/a Chrysler Group, LLC ("Chrysler") and Grammer Industries, Inc., ("Grammer"), and allege:

### I.    INTRODUCTION

1.      For more than a decade, Chrysler has been manufacturing, advertising, selling, and leasing cars with headrests exhibiting a defect with threatens occupants' safety.  Embedded in the headrest is a mechanism, known as an "active headrestraint" ("AHR"), which is designed to spring forward upon a rear-end collision and rapidly push the headrest out to catch the occupant's head and prevent whiplash.  The headrest and AHR are manufactured by Grammar and installed in several Chrysler vehicles.

2.      All of the AHRs share a common, uniform defect.  Under normal conditions, the

AHR can deploy without warning or external force from a collision, and forcefully strike the back of the occupant's head.  The force of the impact can cause serious bodily harm to the head and neck, and further creates a risk of collision when the headrest deploys–suddenly and without warning– while the vehicle is being driven.

3.      The AHR spontaneously deploys when, under normal operating conditions, a cheap plastic component inside the device fails.  The AHR contains a plastic bracket that acts as the triggering mechanism and holds the spring-loaded release in place until a sensor signals a rear-end collision.  As a cost-saving measure, Defendants designed this bracket with an inferior and inexpensive form of plastic which cracks and breaks down prematurely under the constant pressure exerted by the springs in the AHR.  There are more than one million Chrysler vehicles equipped with the defective AHR in the United States, and there is no way for a vehicle owner to predict when the AHR in the headrest may deploy.

4.      The defective AHR is a "safety-related defect", as defined by the National Highway and Traffic Safety Administration (NHTSA).  Specifically, NHTSA states that examples of defects related to safety include:

> Car seats and booster seats that contain defective safety belts,
> buckles, or *components* that create a risk of injury not only
> in a vehicle crash, but also in the nonoperational safety of
> a motor vehicle. (emphasis added). [1]

5.      NHTSA also defines safety-related defects to include "[s]eats and/or seat backs that fail unexpectedly during normal use.[2]

---

[1] *See* https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/14218-sdefectsandrecalls_041619-v2-tag.pdf

[2] Motor Vehicles and Safety Defects: What Every Owner Should Know, *available at* https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm (last visited on 12/12/2019).

6. In fact, NHTSA opened an investigation into the AHRs in Chrysler vehicles on September 9, 2019, entitled "Active Headrest Inadvertent Deployment," in which NHTSA is reviewing the reports of AHRs posing a safety hazard through their inadvertent deployment. *See* NHTSA Preliminary Evaluation 19-014.

7. Information regarding the defective AHR and the safety hazard it poses to vehicle occupants was, until recently, in the exclusive possession of Defendants and was not provided to Plaintiffs and Class members. Plaintiffs and the Class members could not have reasonably discovered the defect through due diligence.

8. Defendants became aware of this safety defect no later than 2010 based on, among other things, engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, plastic material data reports, consumer complaints to NHTSA, consumer complaints to Chrysler dealerships, consumer complaints on website forums, aggregate warranty data compiled from Chrysler dealerships, and repair orders and parts data received from dealerships. Defendants were intimately involved in the design and testing of the AHR systems and were aware that they were designed with an inferior, inexpensive, plastic that cannot withstand the constant force applied by the springs.

9. In addition, upon information and belief, Defendants became aware of this safety defect after conducting their own investigation into the reports and cause of the spontaneous deployments.

10. Grammer is further aware of the defect because the same defective AHR system, which it manufactures and sells, has been the subject of numerous incidents involving Mercedes-Benz vehicles.[3]

11. Despite this exclusive and superior knowledge, Grammer continued to design and manufacture the defective AHR for use in Class Vehicles, Chrysler continued to direct and approve the defective AHRs for use in its vehicles, Chrysler continued to distribute the Class Vehicles to its dealers, and dealers continued to sell Class Vehicles with the defective AHR. Additionally, Defendants have refused to issue a recall, remedy the defect, or compensate Plaintiffs and the Class members for their damages.

12. Despite knowing of the dangers caused by the poorly designed bracket, Defendants have taken no action to correct the problem and continue to manufacture, sell, or lease, and knowingly misrepresent as safe, vehicles containing the defective AHR. Defendants have not issued a recall or made any attempt to notify Chrysler owners of the defect. To the contrary, when presented with deployed, defective headrests, Chrysler refuses to cover the cost of replacing the defective AHR after it spontaneously deploys, blaming the consumer and disclaiming any responsibility.

13. Consumers rely on automobile manufacturers to design, manufacture, market, and sell vehicle that are safe and protect against the risk of bodily injury. Consumers do not expect vehicle manufacturers to make or install products that increase the risk of injury or malfunction while the vehicle is in ordinary use. When Plaintiffs and the Class members purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free

---

[3] See Lewis et al v. Mercedes-Benz USA, LLC., et al, Case No: 19-cv-81220-RAR (S.D. Fla.)

from defects and that Defendants would not design and manufacture the AHR with an inherent safety risk to occupants simply to enrich themselves through a cost-saving measure.

14. As a direct result of the defective AHR and Defendants' fraudulent concealment thereof, Plaintiffs and Class members did not receive the benefits of their bargains and have been harmed and suffered actual damages, including overpayment for their Class Vehicles, loss of use of their Class Vehicle, costs and lost time associated with bringing in their Class Vehicles for diagnosis, repair, and replacement of components, and the actual costs of diagnosis, repair, and replacement components to address or repair the defective AHR.

15. This lawsuit seeks to compel Defendants to notify owners of all affected vehicles of the defect in the AHR; to repair and replace the defective and dangerous headrests; and to compensate Class members for their losses arising from the defect.

16. The Chrysler vehicles equipped with headrests containing the defective AHR are referred to herein as the "Class Vehicles." Each of the Class Vehicles has the same AHR headrest and contains the same defect. The model years and makes of the Class Vehicles include[4]:

2010-2018 Dodge Journey;

2010-2011 Dodge Nitro;

2010-2012 Jeep Liberty;

2010-2017 Jeep Patriot or Compass;

2010-2012 Dodge Caliber;

2010-2018 Dodge Caravan;

2011-2018 Dodge Ram C/V 2011-2018

Dodge Durango; 2011-2018

---

[4] Discovery in this matter may reveal additional vehicles containing the defective AHR.

Jeep Grand Cherokee; 2010-2014

Sebring/Avenger; 2011-2018

Chrysler Town & Country;

2011-2018 Chrysler 200; and 2011-2018 Chrysler 300

Sebring/Avenger; 2011-2018

Chrysler Town & Country

## II. PARTIES, JURISDICTION AND VENUE

### Plaintiffs

17.    Plaintiff Amanda Dantoni is a Louisiana citizen residing in Harvey, Louisiana. She is a natural person over the age of twenty-one, and otherwise sui juris.

18.    Christopher Carroll owns a 2014 Chrysler 200 vehicle, which he purchased from on February 27, 2021.  This dealership authorized by Chrysler to sell Chrysler 200 vehicles. This dealership operates as an agent of Chrysler.  Mr. Carroll's class vehicle is equipped with headrest containing the defective AHR.

19.  Amanda Dantoni was the operator of the Chrysler 200 vehicle purchased by plaintiff, Carroll referenced above when on June 6, 2023, she was injured as a result of the head rest in the Chrysler 200 vehicle said headrest containing the defective AHR.  Plaintiff Dantoni was unaware either that Chrysler had installed the Grammar headrest with the defective AHR or that the vehicle was not fit for everyday use.

20.  When Plaintiff Carroll purchased his Class Vehicle, he was unaware that it contained the defective AHR. Plaintiff Carroll bought his vehicle and paid a premium price, because he trusted Chrysler to provide high-quality and safe automobiles. Prior to purchasing the vehicle, Plaintiff Carroll was aware of, reviewed, or heard Chrysler's warranties and advertisements publicizing its

reputation for safety and reliability. These materials and advertisements did not disclose either that Chrysler had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use. The value of Mr. Carroll's vehicle has been diminished as a result of the defective AHR. Had Plaintiff Carroll known of the AHR defect, he would not have purchased the vehicle or would not have paid as much for it as he did.

21.   None of the advertisements reviewed or representations received by Plaintiffs included any mention or disclosure of the defective AHR and its associated safety hazard.  Had Defendants disclosed that the 2014 Chrysler 200 contained the defective AHR and its associated safety hazard, Plaintiff would have not purchased the vehicles, or he would have paid significantly less for the vehicle.

22.   When Plaintiffs and Class members purchased or leased their Class Vehicles, they relied on the reasonable expectation that the Class Vehicles would be equipped with an AHR that was free from defects, safe to operate, and would not pose a threat to their safety or the safety of occupants or other drivers. In fact, Chrysler has always emphasized the quality and reliability of the Class Vehicles, knowing that consumers, including Plaintiffs and Class members, rely upon such representations when purchasing or leasing vehicles. Had Defendants disclosed that the defective AHR in the Class Vehicles could spontaneously and dangerously deploy during normal use of the car, posing a safety hazard to vehicle occupants and other drivers, Plaintiffs and Class members would not have purchased or leased their Class Vehicles or would have paid significantly less for their respective vehicles.

23.   Plaintiffs and Class members operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used. Plaintiffs and the Class members have suffered an ascertainable loss as a result of Defendants' unfair and deceptive conduct, breach of common law and statutory duties, and omissions and misrepresentations relating to the defective

AHR and its associated safety hazard, including but not limited to, out-of-pocket losses and diminished value of their vehicles.

24. Neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs and Class members of the AHR defect and its associated safety hazard prior to Plaintiffs' and Class members' purchase or lease of the Class Vehicles.

25. There are no material differences between Plaintiffs' circumstances and those of the putative Class members. Each Plaintiff and putative Class member owns or leases a Class Vehicle with the defective AHR. Each Plaintiff and putative Class member was similarly damaged by Defendants because they did not receive the benefit of their bargain and purchased or leased Class Vehicles that are of a lesser standard, grade, or quality than represented. Defendants possessed superior and exclusive knowledge of the AHR design and knew, should have known, or recklessly disregarded the fact that the AHR system in the headrests were defective and concealed this knowledge from the public, Plaintiffs, and the putative Class members, and instead marketed the Class Vehicles as safe, reliable, and defect-free.

26. Each Plaintiff and putative Class member was deprived of having a defect-free headrest installed in their vehicle and Defendants have been, and are being to this day, unjustly enriched from their unconscionable delay in repairing or replacing the headrests or issuing a recall (and thereby saving the cost of a recall) on the defective AHR headrests.

**<u>Defendants:</u>**

27. Defendant FCA US LLC is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. It is the U.S. subsidiary of Italian multinational automaker Fiat, S.p.A. FCA US LLC is formerly known as Chrysler Group, LLC. It is in the business of designing, testing, manufacturing, marketing, selling, and supporting the Class Vehicles that are the

subject of this complaint. It does business nationwide. FCA US LLC is referred to herein as "Chrysler" or as a "Defendant."

28. At all relevant times, Chrysler, directly or through its agents, manufactured, distributed, warranted, sold, and leased the Class Vehicles throughout the United States and in this District. Further, Chrysler, directly or through its agents, marketed and promoted the sale of the Class Vehicles throughout the United States and in this District.

29. Chrysler approved and installed the defective AHR in the Class Vehicles and approved and publicized marketing and advertising designed to sell the Class Vehicles as equipped with an AHR as a "standard and effective safety feature." Chrysler sold Class Vehicles with the defective AHR in all fifty states, including Florida.

30. There are approximately 2,640 authorized Chrysler dealerships in the United States. In 2018 alone, Chrysler sold more than two million vehicles, including Class Vehicles in the United States, and generated more than $2.8 billion in revenue in North America, two-thirds of which were from sales in the United States. Chrysler employs over 60,000 workers in the United States.

31. Chrysler dealerships operate as agents of Chrysler. Upon information and belief, technicians, mechanics, and other employees receive job training from Chrysler at training facilities; technicians follow instructions published and disseminated by Chrysler when diagnosing and repairing vehicle issues; service managers' report to Chrysler each time a fault is detected in a vehicle brought in for service or repair; and Chrysler approves or denies payment for services and repairs provided under warranty.

32. Chrysler's purposeful conduct availing itself of the market in the United States and this District resulted in the sale of Class Vehicles to Plaintiffs and the damages Plaintiffs suffered. If not for Chrysler's distribution and promotion of Class Vehicles in the United States and this District, Plaintiffs could not and would not have purchased Class Vehicles or suffered the resulting damages.

***Grammer***

33. Defendant Grammer Industries, Inc. is a South Carolina for-profit corporation with its principal place of business in Troy, Michigan. Grammer develops and manufactures automotive interior components including headrests, armrests, and center consoles which automobile manufacturers like Chrysler then install in their vehicles that are sold in this District and throughout the United States.

34. Grammer manufactures the headrests that include the defective AHR and supplies them to Chrysler for installation in the Class Vehicles. Grammer supplied these headrests to the Chrysler Defendants with the intent and knowledge that such headrests would be equipped in Class Vehicles for sale in this District and throughout the United States.

35. Further, upon information and belief, Grammer supplies replacement AHR headrests directly to Chrysler's dealerships in this District after the inherent defect has caused the originally installed headrests to spontaneously deploy.

37. Further, upon information and belief, Grammer supplies replacement AHR headrests directly to Chrysler's dealerships in this District after the inherent defect has caused the originally installed headrests to spontaneously deploy.

## Jurisdiction and Venue

38. This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA") and 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Chrysler's home states of Michigan and Delaware and Grammer's home states of South Carolina and Michigan. Upon information and belief, the total amount in controversy in this action exceeds $5,000,000 exclusive of interest and costs. Jurisdiction is also proper in this Court under 28 U.S.C. § 1331 because Plaintiffs bring federal Magnuson-Moss claims. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

39.  This Court has personal jurisdiction over Defendants because Defendants, directly or through an agent, conduct substantial business in this judicial district; some of the actions giving rise to the claims took place in this judicial district; and some of the claims arise out of Defendants, directly or through an agent, operating, conducting, engaging in, or carrying on a business or business venture in Louisiana, committing a tortious act in this state, and causing injury to property in Louisiana arising out of Defendants' acts and omissions outside of Louisiana; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within Louisiana, or products, materials, or things processed, serviced, or manufact0.red by Defendants were used or consumed within Louisiana in the ordinary course of commerce, trade, or use and Defendants, directly or through an agent, derived substantial revenue from their activities within this State.

40.  Louisiana  has significant contacts with Chrysler, as there are many Chrysler dealerships in Louisiana. Chrysler dealerships are agents or alter egos of Chrysler. In addition, Chrysler operates one if its technician training programs out of Sheridan Technical College in Hollywood, Florida, within the Southern District of Florida.

41. Louisiana also has significant contacts with Grammer. Plaintiffs could not have purchased the Class Vehicles with the defective AHR headrests if not for Grammer's intentional acts of designing and installing the defective AHR systems in Class Vehicles for sale to customers in this District. In addition, upon information and belief, Grammer distributes the defective AHR headrests to Chrysler dealerships in Louisiana and this District for repair/replacement work when an AHR has spontaneously deployed.

42. Grammer has received substantial benefit from knowingly engaging in manufacturing activities directed at automobile purchasers in this judicial district. Specifically, Grammer has purposely availed itself of the Louisiana automotive market by producing and selling components

11

specifically intended for installation in vehicles sold in Louisiana. Plaintiffs' claims against Grammer arise directly from the sale of its products in this District.

43. Both Chrysler's and Grammer's purposeful availment and extensive contacts with Louisiana renders the exercise of jurisdiction by this Court over them and their respective affiliated or related entities permissible under traditional notions of fair play and substantial justice.

44.  Further, this Court has personal jurisdiction over Defendants with respect to Plaintiffs' federal claim, and under supplemental or pendant jurisdiction with respect to Plaintiffs' state law claims.

45. Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because one of the named Plaintiffs resides in this judicial district and purchased his Class Vehicle installed with headrests containing the defective AHR in this district. In addition, both Chrysler and Grammer transact business in Louisiana, and a substantial portion of the practices, events, and omissions complained of herein occurred in this judicial district.

46. All conditions precedent to this action have occurred, been performed, or have been waived.

### III. FACTUAL ALLEGATIONS

#### Background

47. Since 2010, Chrysler has advertised, distributed, leased, and sold numerous Class Vehicle models equipped with headrests containing the defective AHR while simultaneously publicizing and promoting the safety of its vehicles.

48. Chrysler and Grammer had exclusive and superior knowledge that the inexpensive plastic used in the AHR could not withstand the constant pressure being applied by the tensed springs and would fail under ordinary use but failed to disclose this information to Plaintiffs and Class members. Consumers, relying on Chrysler's longstanding self-promoted reputation for quality vehicles, paid

heightened prices for Class Vehicles that pose a serious and unpredictable risk of injury to drivers, occupants, and the public because of the defective AHR manufactured by Grammer and installed by Chrysler.

49. The AHR is marketed as a critical safety device for preventing or reducing cervical injuries, such as whiplash, during rear-end collisions. It is designed to propel the headrest forward, towards the head, to cushion and arrest the abrupt backward movement of the driver or passenger head after impact.

50. The internal components of the defective AHR are the same across all Chrysler Class Vehicles: the forward-facing padded surface of the headrest is mounted to a plastic carriage that is loaded by pre-tensioned springs when stowed in the headrest prior to deployment. The carriage is secured in the stowed position by a pin-and-hook latch assembly. The pin is secured in a nest in the carriage and the latch, in turn, is linked to the vehicle's electronic computer control unit. When the control unit detects a rear-end collision exceeding some threshold of severity, a signal triggers the pin-and-hook latch to release the pin allowing the carriage to be forced forward by the springs, rapidly deploying the face of the headrest forward.

51. When a vehicle is involved in a rear-end collision, the device propels the face of the headrest forward by 40 millimeters and upwards by 30 millimeters, to meet the head as it travels backwards. The device fully deploys in .027 seconds. This is known as a commanded deployment, and is the intended function of the AHR.

52. However, rather than operating as intended, the defective AHR poses a serious risk of harm because it is substantially certain to malfunction and deploy (and strike the occupant of the seat) when the vehicle is in normal use in the absence of a rear-end collision. The crucial internal component that restrains the AHR is the plastic carriage that is secured by the latch pin against the force of the compressed springs. As a cost-saving measure by Defendants, the bracket keeping the

pin in place until a rear-end collision is sensed, is made from a low-quality, inexpensive, plastic called Acrylonitrile Butadiene Styrene, or ABS. The two linear springs combined exert 75 pounds of force on the ABS plastic bracket at all times, and cause the ABS comprising the bracket to weaken over time through normal use.

53. As early as 2010, Defendants had the exclusive and superior knowledge, and concealed their knowledge, that this particular plastic cannot withstand this constant pressure and is prone to cracking and breaking, allowing the pin to be released from the carriage, rather than from the latch, and spontaneously deploying the headrest even when the vehicle has not been involved in a rear-end collision.

54. When the plastic breaks down, the carriage deploys at random—rather than only in a rear-end collision—suddenly striking the driver or passenger in the back of the head. The AHR deploys the headrest at a rate of 12 miles per hour, or nearly 18 inches per second, impacting the back of the passenger's head with enough force to cause injuries.[5] The uncommanded deployment can occur at any time, including while the vehicle is driving on highways or public roads.

55. Inspection of headrests in which the defective AHR has randomly deployed reveals that the AHR will deploy when *not* commanded by the vehicle's computer sensor. The latch and pin assembly remains engaged, but when the plastic bracket that holds the pin fails and breaks under the strain of pent-up spring tension, it causes the springs to release and deploy the AHR without the hooks releasing the pin.

56. One can determine, through visual inspection, whether a deployment was commanded or uncommanded. Because the hooks retract in a commanded deployment, an intact hook-and-pin

---

[5] *See e.g.*, https://www.nbclosangeles.com/investigations/randy-responds/chrysler-recall-jeep-headrest-concussion/170325/ (December 3, 2018, news report out of California regarding a 2014 Chrysler Town and Country minivan that spontaneously deployed and gave the vehicle owner a concussion).

assembly (as well as the broken plastic) indicates that an uncommanded deployment has occurred.

59. No reasonable consumer expects to purchase or lease a vehicle with a defective AHR that exposes them to a serious safety hazard. Further, Plaintiffs and Class members did not reasonably expect Defendants to conceal a defect in the Class Vehicles or conceal a known safety hazard. Plaintiffs and Class members had no reasonable way to know that Class Vehicles contained the defective AHRs, which were defective in materials, workmanship, design, and manufacture, and posed a serious and real safety hazard.

57. As a result of Defendants' material omissions and misrepresentations, as set forth herein, including Defendants' failure to disclose that the Class Vehicles contain a defective AHR, Plaintiffs and Class members paid more for their Class Vehicles than they would have and suffered other actual damages, including but not limited to out-of-pocket expenses and the diminished value of their vehicles. The defective AHR in the headrests installed by Chrysler makes the Class Vehicles unsafe to drive and Plaintiffs and putative Class members would not have purchased or would have paid less for the Class Vehicles had they known of the defect.

**Chrysler Markets the AHR as a Safety Feature**

58. In promotional materials and advertising, Chrysler repeatedly touts that it is dedicated to safety with respect to the design and manufacture of its vehicles. For example, in the brochures for Jeep Cherokees, Chrysler proclaims that these vehicle have "over 70 available safety and security features" and that "beneath the surface of the Jeep Grand Cherokee lies a work of safety... systems that give you confidence behind the wheel and help protect you and your passengers." In advertising for its Chrysler 300, Chrysler asserts that these vehicles have "80+ standard and available safety features" and are "Equipped to Protect." The brochure for its Town and Country vehicles states that Chrysler's "care for future generations meet your safety standards."

59. In brochures for various Class Vehicles, Chrysler identifies the AHR as a "safety and security" feature and further describes the AHR as "[a] standard and effective safety feature that can help stave off neck injuries. Restraints automatically react and adjust to help provide protection during rear-impact collisions."

60. Chrysler's advertisements and other public statements highlight the intended function of the AHR: a safety device that protects vehicle occupants during a collision. However, due to the low-cost, inferior, plastic used for the bracket holding the AHR rod in place, the reality is that the AHR in the headrest poses a risk of injury to drivers, passengers, pedestrians, and occupants of surrounding vehicles because the AHR deploys unpredictably, when no external force has occurred.

61. Despite Defendants' exclusive and superior knowledge, none of Chrysler's manuals, advertisements, or other public statements disclosed the fact that the AHR was defective and could spontaneously deploy during the normal operation of the car.   Chrysler's manuals, advertisements, and other public statements were intended to omit and conceal this fact from Plaintiffs.

**Class Chrysler AHRs Have a Common Uniform Defect**

62. Grammer manufactures the headrests with the defective AHR that Chrysler installs  in the Class Vehicles. As discussed above, the plastic bracket in the AHR is made from Acrylonitrile Butadiene Styrene (ABS). ABS is a lightweight, recyclable, thermoplastic polymer with relatively cheap production costs. ABS is frequently used for inexpensive consumer products, such as children's toys, kitchen utensils, and faceplates for electric outlets.

63. ABS is unsuitable for use in the AHR, as it does not withstand fatigue well. The resistance to the stored potential force of the two compressed springs in the AHR creates continuous pressure which, over time, inevitably leads to what is known as a "plastic creep" and eventually to cracking and component failure. ABS is prone to tell-tale "stress-whitening," where the plastic creep

16

and cracking is occurring, allowing one to see where the plastic's integrity has been compromised and where the plastic will break.

64. The ABS plastic will break solely due to the force of the springs but is even more susceptible to failure in severe hot or cold weather.

65. What is even more egregious about the use of this inexpensive and inferior ABS plastic is that other components of the headrest were designed with a fiber-glass reinforced plastic, which is much stronger and more durable (but also more expensive) and capable of withstanding the constant force of the springs.

66. Despite their awareness of the safety issues caused by a sudden and unexpected AHR deployment, being further aware of plastic material that should have been used in the design, and being on notice that the AHR has a dangerous safety defect, the Defendants refuse to warn customers, issue a recall, or take responsibility for repairing or replacing the AHR headrests in the Class Vehicles. Instead, Defendants concealed the fact and nature of the defect from Plaintiffs, Class members, and the public and continue to sell and distribute Class Vehicles equipped with the defective AHR.

**Defendants' Knowledge of the AHR Defect and Associated Safety Hazard**

67. Based on engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic material data reports, consumer complaints to NHTSA, consumer complaints to Chrysler dealerships, consumer complaints on website forums, aggregate warranty data compiled from Chrysler dealerships, repair orders and parts data received from dealerships, amongst other things, Defendants have known since at least 2010 that the AHR was made with an inferior plastic that could not withstand the pressure it was exposed to and would prematurely fail during normal use of the vehicle.

68. In addition, upon information and belief, Defendants became aware of this safety defect after conducting their own investigation into the reports and cause of the spontaneous deployments.

69. Chrysler, Grammer, and their agents possessed this exclusive and superior knowledge and information regarding the defective AHR but concealed the defect and its associated safety hazard from Plaintiffs and Class members.

70. Defendants fraudulently and intentionally omitted and concealed from Plaintiffs and Class members the defective AHR in the Class Vehicles, even though Defendants knew or should have known of the materials and design defects in the Class Vehicles.

71. Defendants knew or should have known that the AHR defect and its associated safety hazards were material to owners and lessees of the Class Vehicles and that Plaintiffs and Class members did not know or could not reasonably discover the AHR defect before they purchased or leased Class Vehicles or before the warranties on their Class Vehicles expired.

72. Notwithstanding Defendants' exclusive and superior knowledge of the defective AHRs, Defendants failed to disclose the defect to consumers, including Plaintiffs and Class members, at the time of purchase or lease of the Class Vehicles (or any time thereafter), and continued to install the defective AHRs in certain Class Vehicles up and until 2018 models. Defendants knowingly and intentionally concealed the AHR defect and associated safety hazard and failed to provide any notice of the defect and associated safety hazard to Plaintiffs and Class members. Chrysler also failed to recall the Class Vehicles to remedy the AHR defect.

73. Indeed, at all relevant times, in advertisements, promotional materials, and other representations, Chrysler continuously maintained that the Class Vehicles were safe and reliable, while uniformly omitting any reference to the AHR defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements, promotional materials, or representations prior to purchasing or leasing their Class Vehicles. The misleading statements and omissions about the Class Vehicles' safety and

reliability in the Chrysler Defendants' advertisements, promotional materials, and representations were material to Plaintiffs' and Class members' decision to purchase or lease the Class Vehicles.

 *NHTSA Complaints*

74. Consumers who purchased or leased Class Vehicles have filed hundreds of complaints with NHTSA, reporting and detailing the defective AHR in the Class Vehicles and ultimately resulting in NHTSA opening an investigation into the AHRs in Class Vehicles.

75. Federal law requires Chrysler to monitor defects that can cause a safety issue and report them within five days to NHTSA. Defendants regularly monitor NHTSA complaints in order to meet reporting requirements under federal law and were, therefore, provided information and knowledge of the defective AHR through these complaints, as well as by other means.

76. As detailed above, Defendants' AHR headrests were designed and manufactured with an inferior and inexpensive plastic and, as can be seen by consumer complaints made to NHTSA, have created issues with uncommanded deployments for years [all sic]:

> a. **Consumer Complaint – NHTSA ID Number: 10925749**
> **2013 Dodge Journey**
> **Date Complaint Filed: 11/14/2016**
> **Date of Incident: 09/28/2016**

ON SEPTEMBER 28 2016 2:30 PM RIDING NORTH ON HWY 59 FROM KINGWOOD WE HAD JUST PASSED THRU SHEPPARD TX. WE HAD BEEN ON CRUISE AT 70 MPH SINCE CLEVELAND TX WHEN WE HEARD A LOUD EXPLOSION. MY HEADREST HAD EXPLODED AND PUSHED MY HEAD FORWARD FAST. MY HUSBAND WAS DRIVING AND HE THOUGHT I HAD BEEN SHOT BY A STRAY BULLET THE WAY MY HEAD BOLTED FORWARD.

> b. **Consumer Complaint – NHTSA ID Number: 11000632**
> **2014 Dodge Durango**
> **Date Complaint**
> **Filed: 06/22/2017 Date of Incident: 06/20/2017**

MY DRIVER SIDE HEADREST DEPLOYED ON ITS OWN WHILE DRIVING DOWN THE ROAD. THE VEHICLE HAS NEVER BEEN IN AN ACCIDENT AND IT IS ONLY 3 YEARS OLD. THE DEPLOYMENT ALMOST CAUSED ME TO WRECK BUT I WAS ABLE TO MAINTAIN MY VEHICLE TO COME TO A STOP IN THE OTHER LANE. I HAVE

CONTACTED THE DEALER AND DODGE WITH NO HELP. THERE EQUIPMENT MALFUNCTION AND I HAVE TO PAY $684 TO HAVE IT REPAIRED. KEEP IN MIND IT IS SUPPOSE TO DEPLOY IN A REAR END COLLISION AND THERE WAS NO COLLISION. IT WAS A SPONTANEOUS DEPLOYMENT.

   c. **Consumer Complaint – NHTSA ID Number: 11101699**
   **2013 Dodge Journey**
   **Date Complaint Filed: 06/13/2018**
   **Date of Incident: 06/08/2018**

THE ACTIVE HEADREST HAS FAILED. I INITIALLY THOUGHT IT WAS DEPLOYED, BUT AFTER ATTEMPTING TO RESET THE UNIT, I NOTICED THE SILVER PIN THAT WAS DESIGNED TO HOLD THE HEADREST IN POSITION WAS LOOSE. THE SMALL PIECES OF PLASTIC THAT HELD THIS IN PLACE HAVE COMPLETELY BROKEN LOOSE, THUS DEPLOYING THE HEADREST. CLOSING THIS BACK INTO POSITION IS NOW IMPOSSIBLE. I CONSIDERED ORDERING A REPLACEMENT PART, BUT WHY SHOULD I BUY SOMETHING THAT IS LIKELY TO FAIL?
I CALLED THE DEALER TO SEE WHAT THEY WOULD CHARGE TO FIX THIS FOR ME, AFTER BEING QUOTED $192 IN LABOR, I DECIDED THAT THEY WOULD NOT BE HELPING ME WITH THIS. I'M GLAD THIS DID NOT SLAP ME IN THE BACK OF THE HEAD WHILE I WAS DRIVING. THIS COULD VERY WELL KNOCK A DRIVER UNCONSCIENCE, OR CAUSE HIM OR HER TO LOSE CONTROL OF THE VEHICLE. IT IS MY OPINION THIS NEEDS TO BE EXAMINED BEFORE SOMEONE IS KILLED, OR DO WE HAVE TO WAIT FOR THAT TO HAPPEN BEFORE A RECALL IS ISSUED? MY VEHICLE WAS STATIONARY. I FOUND THE HEADREST OPEN WHEN I OPENED THE DOOR TO GO TO WORK. I WOULD BE MORE THAN HAPPY TO DISCUSS THIS FURTHER. I CAN GET PHOTOS OF THE BROKEN HEADREST, I'M AT WORK AT THE MOMENT, BUT I CAN TAKE PICTURES TONIGHT AND UPLOAD TOMORROW IF NEED BE.

   d. **Consumer Complaint – NHTSA ID Number: 11120869**
   **2014 Dodge Caravan**
   **Date Complaint Filed: 08/19/2018**
   **Date of Incident: 04/01/2018**

WHILE DRIVING, THE VEHICLE ACTIVE HEAD RESTRAINT DEPLOYED, ON ITS OWN, PUSHING MY HEAD FORWARD. NO COLLISION HAD OCCURRED AT THE TIME OF DEPLOYMENT. THE HEAD RESTRAINT LOOKS AS IF THE PLASTIC BRACKET INSIDE BROKE BECAUSE I TRIED RESETTING THE HEAD RESTRAINT, PER MANUFACTURER INSTRUCTIONS, BUT IT WILL NOT RESET. HEAD RESTRAINT NEEDS TO BE REPLACED WITH A NEW PART.

   e. **Consumer Complaint – NHTSA ID Number: 11120869**
   **2014 Dodge Caravan**
   **Date Complaint Filed: 01/22/2018**
   **Date of Incident: 01/21/2018**

DRIVER'S HEADREST DEPLOYED DUE TO THE PLASTIC THAT HOLDS A PIN BROKE
INTERNALLY. THIS SPRING LOADED SYSTEM APPARENTLY HAD ENOUGH TENSION
THAT IT BROKE THE PLASTIC. MY VEHICLE WAS STATIONARY AND UNOCCUPIED AT
THE TIME. IF I HAD BEEN SITTING IN THE VEHICLE MY NECK COULD HAVE BEEN
BROKEN. A REPLACEMENT HEADREST IS ABOUT $650, NOT INCLUDING LABOR,
ACCORDING TO THE DEALERSHIP AND I WAS TOLD IT IS NOT IN WARRANTY. I HAVE
HAD THIS VEHICLE LESS THAN 4YRS.

    f. **Consumer Complaint**
2013 Dodge Journey
**Date Complaint Filed: 06/08/2019**
 **Date of Incident: 05/02/2019**

PASSENGER FRONT SEAT HEADREST DRIVING DOWN THE ROAD THE HEADREST
SHOT OPEN STRIKING MY WIFE IN THE BACK OF THE HEAD FOR NO APPARENT
REASON. I HAVE READ OTHER ISSUES OTHER PEOPLE HAVE EXPERIENCED SAME
PROBLEM. THIS IS DANGEROUS AND NEEDS TO BE ADDRESSED BEFORE A ACCIDENT
HAPPENS AND SOMEONE GETS KILLED. I THINK DODGE SHOULD BE RECALLING
THESE VEHICLES FOR THESE ISSUES.

    g. **Consumer Complaint – NHTSA ID Number: 11235208**
**2013 Dodge Journey**
**Date Complaint Filed: 07/26/2019**
**Date of Incident: 07/26/2019**
I WAS DRIVING ALL THE SUDDEN I HEAR THIS POP SOUND MY HEADREST BUSTED
OPEN THE PLASTIC BROKE INSIDE. I HAVE READ LOOKED UP THAT IT HAS HAPPEN
TO A LOT OF PEOPLE.

    h. **Consumer Complaint – NHTSA ID Number: 11282652**
**2016 Jeep Patriot**
**Date Complaint Filed: 11/27/2019**
 **Date of Incident: 11/25/2019**

ACTIVE HEADREST WAS DEPLOYED/ACTIVATED WHILE IDLE AT A RED LIGHT, THE
HEADREST HIT THE BACK OF MY HEAD AND MADE ME RELEASE THE BRAKE WHILE
STOPPED AT A RED LIGHT, THERE WAS ALSO A VERY LOUD NOISE (KIND OF LIKE A
GUN SHOT NOISE). THIS WAS VERY SCARY AS I HAD NO IDEA WHAT HAD HAPPENED
OR WHAT HAD HIT MY HEAD, I HAD TO PULL TO THE SIDE OF THE ROAD AND
EXAMINE MY CAR TO MAKE SURE IT WAS SAFE TO DRIVE IT. ALL THIS WHILE I WAS
IN PAIN RESULTING FROM THE HEADREST HITTING THE BACK OF MY HEAD.

    i. **Consumer Complaint – NHTSA ID Number: 11140239**
**2016 Jeep Patriot**
**Date Complaint Filed: 10/14/2018**
**Date of Incident: 10/04/2018**

DRIVER'S SIDE ACTIVE HEADREST SELF-DEPLOYED. VEHICLE WAS STATIONARY
AND PARKED OVER NIGHT IN GARAGE. PLASTIC RETAINER FRACTURED LEADING TO
DEPLOYMENT.

    j. **Consumer Complaint – NHTSA ID Number: 11300648**
    **2015 Jeep Grand Cherokee**
    **Date Complaint Filed: 01/21/2020**
    **Date of Incident: 12/02/2019**

I WAS DRIVING ONE DAY WHEN SUDDENLY I WAS STRUCK EXTREMELY HARD ON
THE BACK OF MY HEAD. SO HARD THAT I THOUGHT I GOT INTO AN ACCIDENT,
ALTHOUGH I DIDN'T I ALMOST CAUSED AN ACCIDENT. MY HEAD AND NECK WERE
HURTING FOR A WHILE, WHEN I PARKED MY VEHICLE I REALIZED THAT MY
HEADREST HAD POPPED OUT. NOT SURE WHY THIS HAPPENED BUT WHEN I WENT TO
RESEARCH THIS PROBLEM I NOTICED THAT A LOT OF PEOPLE HAVE BEEN
COMPLAINING ABOUT AHR RANDOMLY BREAKING AND DUE TO THE FACT THAT IT
ALMOST CAUSED AN ACCIDENT AND HOW HARD I GOT HIT I BELIEVE THAT THIS IS
A CAUSE FOR CONCERNS AND AN UNSAFE CONDITION. I TOOK MY CAR BACK TO
THE DEALERSHIP AND THEY TOLD ME THE WARRANTY WOULDN'T COVER THIS NOR
WAS THEIR ANY RECALL ON MY VEHICLE. I DUG A LITTLE DEEPER INTO THIS
MATTER AS I SAW HOW MANY COMPLAINTS THERE WERE AND SAW THAT THIS
ISN'T THE FIRST TIME THIS VEHICLE HAS HAD THIS PROBLEM AND THE FACT THAT
THERE IS A HISTORY SHOULD AT LEAST CAUSE AN INVESTIGATION. WITH ALL THAT
BEING SAID, THANK YOU IN ADVANCE FOR YOUR ATTENTION TO THIS MATTER AND
HAVE A NICE DAY.

    k. **Consumer Complaint – NHTSA ID Number: 11020593**
    **2015 Jeep Grand Cherokee**
    **Date Complaint Filed: 08/30/2017**
    **Date of Incident: 08/19/2017**

THE PASSENGER SEAT HEAD RESTRAINT SYSTEM ACTIVATED FOR NO KNOWN
REASON WHILE DRIVING 70 MPH ON THE INTERSTATE. THE VEHICLE WAS NOT IN
ANY ACCIDENT OR NO FACTORS CAUSED THIS. THE HEAD REST VIOLENTLY SHOT
FORWARD APPROX 6" IF THIS WOULD HAVE BEEN THE DRIVERS SEAT IT WOULD
ALMOST CERTAINLY CAUSED THE DRIVER TO LOOSE CONTROL OF THE JEEP.

### _Consumer Complaints_

    77. Chrysler vehicle owners have also shared their experiences with the AHR defect on

websites devoted to Chrysler vehicles, which, upon information and belief, Defendants are aware of

and regularly review. Examples of these consumer complaints include [all sic]:

    My 2015 Jeep Patriot Driver side headrest deployed and shot plastic all over the place.

Luckily noone was hurt. [6]

I got my Jeep yesterday after it being parked in the driveway overnight, to notice that the active headrest on the passenger side was sticking out. After closer inspection I came to dind that the tabs at the top of the headrest were broken so it cannot be re-engaged. [] I'm glad that it didn't happen to the driver side while my wife or I was driving.  I'm sure it would have caused us to wreck with something smacking into the back of our heads unexpectedly.[7]

This happened tonight with my 2016 Jeep Compass with only 3600 miles on it.  The passenger side deployed without provocation while driving it down a residential street going approximately 15  mph. Fortunately, a passenger was not sitting in the passenger seat when it deployed. It appears that a plastic part broke, which caused the deployment. I have an appointment with the Jeep dealership on Friday. I am afraid to drive the vehicle now after reading articles about people suffering concussions from their Jeep headrest deploying without provocation. Apparently, there are several lawsuits pending regarding these defective headrest. SHAME ON JEEP FOR NOT REPLACING THESE HEADRESTS FREE OF CHARGE!!! THIS IS A SAFETY ISSUE CAUSED BY A DEFECTIVE PRODUCT.[8]

My car was sitting in the sun one day and I came out and the driver side "tabs" were broken and the headset was popped. It is not fixable. The dealer wants $700 for just the headrest. [9]

Pulled out of a parking lot last week in my 2014 GC and boom - driver's headrest popped out. Plastic tabs appear broken, and the dealer wants $994 to replace - not covered under a recall and out of warranty.[10]

Front Seat Head Restraint problem of the 2013 Chrysler 200 - Failure Date: 09/15/2019: Driver seat headrest deployed while driving on smooth highway surface at 70 mph making a large noise and hitting hard the back of driver's head. There were no lights or indication of problems on the dash board. After I examined the headrest the plastic holding the metal bar had deteriorated so that the bar could not be placed back in its original spot, and the bar was found in the clamp below. The clamp was still locked. The headrest could not be reset since the plastic was broken.[11]

Front Seat Head Restraint problem of the 2013 Chrysler 200 - Failure Date: 08/29/2019: At approximately 3:10pm on 8/29/19, the car was on and in park with the ac turned on, as my son in law was placing his 33-month baby in the car seat, located behind the driver's seat. My son in law sat down in the driver seat and was pulling his feet into the vehicle when he heard a loud blast and felt the seat headrest explode against his neck and back. He states he may have blacked out for an undetermined time. He noted that the headrest was split apart.[12]

---

[6] *See* https://www.jeepgarage.org/threads/broken-active-headrest-ahr.105313/page-10

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *See* http://www.carproblemzoo.com/chrysler/200/front-seat-head-restraint-problems.php

[12] *Id.*

Front Seat Head Restraint problem of the 2013 Chrysler 200 - Failure Date: 8/20/2019: On August 20th I noticed the headrest on the front passenger seat had deployed. The headrest mechanism deployed while the vehicle was parked. I noticed several small pieces of black plastic on the front passenger seat. Upon examining the headrest, I saw that the plastic which was supposed to hold a spring mechanism had failed.[13]

Front Seat Head Restraint problem of the 2012 Chrysler 200 - Failure Date: 08/05/2019: Both of my headrests popped open for no reason. The passenger headrest happened two years ago and the driver's seat headrest happened this week. The vehicle was not involved in any type of collision or impact when the headrests popped open. I was driving smoothly on the road when they happened.[14]

2014 Town & Country - Head rest blew open with a loud bang driving on interstate on passenger side. The plastic inside that holds a metal rod broke. The rod was still seated in the trigger and appears to be caused by weak plastic used to hold the rod and head rest in position until collision sensor releases it. This is part of the air bag system and is to protect from whiplash in rear end collision. Car has 47,000 miles so is not under warranty but it seems it should be as it is part of the safety equipment.[15]

78. Consumers have went as far as posting pictures of the broken AHR in their Class

Vehicles. [16]

**Grammer and Chrysler Fail to Divulge the Defect**

79. Grammer knew, before supplying its AHR product to Chrysler, that the AHR is defective.

Despite this knowledge, Grammer has continued to use inferior and cheap plastic to manufacture the

AHR bracket, and has neither addressed the plastic bracket design defect, nor advised Plaintiffs or

the putative Class members about the safety risk. As the manufacturer of the headrests with the

defective AHR, Grammer has, and has had for years, knowledge superior to consumers about the

quality of the plastic bracket in the AHR and should have known that buyers and owners of the Class

Vehicles could not discover the defect before purchasing or leasing their Chrysler.

---

[13] *Id.*

[14] *Id.*

[15] *See* https://www.chryslerforum.com/forum/chrysler-voyager-town-country-21/broken-active-head-restraint-29755/

[16] *Id.*

80. Chrysler had exclusive and superior knowledge, prior to installing the defective AHR, that the design was defective and the AHR is likely to malfunction. Similarly, given the location of the AHR and its intended purpose, Chrysler, and Grammer, knew or should have known that such a malfunction could cause injury to drivers and passengers, and that an uncommanded deployment might cause a driver to lose control of his or her vehicle while driving, thus endangering not only the occupants of the vehicle, but other people on the road.

81. Despite being aware of the AHR defect, and the potential for harm to human life, Defendants have failed to notify owners of Class Vehicles of the defect, have not recalled affected Class Vehicles to replace the defective AHR, and have made no attempt to compensate Class Vehicle owners for the diminution in vehicle value.

82. Grammer has intentionally taken no action to reveal the defect in the AHR, and instead concealed and failed to disclose the safety issue caused by the defective AHR components.

83. Likewise, Chrysler intentionally misrepresents the safety features of its headrests and conceals the defect from consumers in its owner's manuals, affirmative statements about the safety of its vehicles, and advertising.

84. In fact, in response to news reports regarding uncommanded deployments, Chrysler denies that a defect is present and that the threat of injury exists, stating:

> FCA U.S. vehicles meet or exceed all federal safety requirements. Customer safety is paramount at FCA US. Active head restraints enhance vehicle safety. Evaluations confirm that even in the rare event of inadvertent deployment there is no unreasonable risk of injury. Absent such risk, there is no safety defect. FCA US strongly objects to any alternate characterization.[17]

85. At all material times, the potential harm caused by the defective material used in Chrysler's AHR system was known to the Defendants. The Defendants had superior and exclusive

---

[17] *See* https://www.nbcmiami.com/news/local/injured-drivers-say-popping-headrests-caused-concussions/164751/

knowledge of the materials defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class members before they purchased or leased the Class Vehicles.

86. Defendants intentionally misrepresented, either affirmatively or by omission, that the AHRs were free from defects and took no action to adequately warn or remedy the defect, but instead concealed, suppressed, and failed to disclose the potential damage that could be caused by such defects. 101. Despite their awareness and actual knowledge of the defect in the design and materials of the AHR referenced herein and the attendant problems evidenced by, among other things, a significant number of customer complaints, repair orders, and warranty claims, Defendants continue to fail to warn, or even mention, anything about the issue.

87. Despite Defendants' notice of the defect from numerous consumer complaints, dealership repair orders, NHTSA complaints, warranty claims, their own investigation, and other sources, they refuse to admit that a defect is present, have not recalled the Class Vehicles to address the defect, have not offered all consumers suitable repair, remedial measures, modifications, or replacements free of charge, and have not offered to reimburse the Class members who incurred costs relating to the defect and subsequent damage to the Class Vehicles. As a result of Defendants' conduct alleged herein, Plaintiffs and Class members have been harmed and have suffered actual damages as referenced herein.

88. Defendants continue to fail to cover the cost to repair or replace headrests that have spontaneously deployed, recall the Class Vehicles, or warn vehicle owners and the general public about the defect and corresponding safety risk of driving or riding in a Chrysler vehicle installed with the defective AHR.

**Plaintiffs Have Been Damaged**

26

89. As a result of Grammer's and Chrysler's conduct in manufacturing, installing, and selling the Class Vehicles containing the defective AHRs and further in failing to disclose and actively and fraudulently concealing the defect, Plaintiffs and proposed Class members were harmed and suffered actual damages. The defective AHR installed in the headrests diminish the value of the Class Vehicles.

90. Plaintiffs and the proposed Class members were deprived of the benefit of their bargain. The Chrysler vehicles they purchased or leased were of a lesser standard, grade, and quality than Chrysler represented, and Plaintiffs and Class members did not receive vehicles that met ordinary and reasonable consumer standards for safe and reliable operation. Plaintiffs and Class members paid more for their vehicles than they would have had Defendants disclosed the defective AHR, whether in monthly lease payments or through a higher purchase price.

91. Chrysler and Grammer both unjustly benefitted from putting a defective product on the market, and Plaintiffs and Class members were deprived of safe, defect-free, components in their Class Vehicles.

92. Plaintiffs and Class members have also suffered out-of-pocket damages, including but not limited to loss-of-use expenses, paying for rental cars or other transportation arrangements, paying for diagnostic testing at repair facilities, and paying to replace headrests damaged by the uncommanded deployment of the AHR that the Chrysler Defendants would not cover.

93. Plaintiffs bring this action on behalf of themselves and putative Class members to recover damages for their lost benefit of the bargain; out-of-pocket expenses, including repair costs due to the defective AHR; and to obtain an injunction requiring Chrysler and Grammer to repair and/or replace the defective AHRs and prevent risk of future harms.

**Chrysler Breaches Express and Implied Warranties**

94. Chrysler sells and leases Class Vehicles with express and implied warranties that assure buyers the vehicles are free from defects. The AHR defect violates these warranties.

95. Chrysler provides a written express warranty to each consumer who purchases or leases a Class Vehicle directly from Chrysler. The warranty specifically covers "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

96. Chrysler, however, continues to deny and conceal that its AHR has a defect. Specifically, Chrysler takes the position that its warranty does not cover the repair or replacement of the AHR system. According to Chrysler, the costs for those repairs should be borne entirely by its customers.

97. Under the Uniform Commercial Code, a warranty that goods are merchantable is implied in all contracts for sale, so long as the seller is a merchant with respect to goods of that kind. U.C.C. § 2-314 (1). To be "merchantable," goods must be fit for the ordinary purposes for which they are used and must conform to the promise or affirmations of fact made on labels.

98. The defective AHR renders Class Vehicles unfit and unsafe for ordinary use at the time of Class Vehicles' initial sale. Further, the AHR fails to conform to the promises of safety and appropriate deployment as described in Chrysler's owners' manuals.

99. The AHR contains an inferior, low-grade plastic component despite the availability of several commercially-viable, superior alternatives. For example, fiber-reinforced plastics, although slightly more expensive, contain either glass fibers or carbon fibers and are readily available to manufacturers and can be used in injection-mold applications like the AHR. In fiber-reinforced plastics, the strength comes from the glass fiber or carbon fiber, while the plastic holds the fibers together and gives the object its shape. These plastics are better suited to withstand the constant force being applied by the two springs. Indeed, other components of the AHR that are not subjected to the constant force of the springs are designed with fiber-reinforced plastic.

28

100. Because the AHR headrest is designed and manufactured with cheap, inferior, low-grade plastic, Chrysler has breached the warranties of merchantability.

## IV. <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

**<u>Discovery Rule Tolling</u>**

101. Within the time period of any applicable statutes of limitation, Plaintiffs and Class members could not have discovered, through the exercise of reasonable due diligence, that Defendants were concealing the defect in the headrests and misrepresenting the safety and reliability of the AHR contained in the headrests installed in Class Vehicles.

102. Chrysler has refused to issue a recall and Class members have no way of knowing about the defect until the AHR in their vehicle spontaneously deploys. Even after a spontaneous deployment, Plaintiffs and Class members had no ability to discover the actual nature of the defect— the use of the cheap plastic that is unable to withstand the constant force of the springs— because Defendants' active concealment, and prior knowledge, of the defect.

103. For these reasons, all applicable statutes of limitations have been tolled by operation of the delayed discovery rule.

**<u>Fraudulent Concealment Tolling</u>**

104. All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the defect in the AHR throughout the time period relevant to this action.

105. Chrysler is under a continuing duty to disclose the true character, quality, and nature of the Class Vehicles to the Plaintiffs and the Class members. Neither Chrysler nor Grammer disclosed information about the defective AHR, and instead, as discussed above, knowingly, affirmatively, or actively concealed such character.

106. Grammer is under a continuing duty to disclose the defect in the AHR that it provided to Chrysler as it knew that the AHR would be placed in the headrests installed in Class Vehicles and sold in the U.S. automotive market.

107. Plaintiffs and Class members reasonably relied upon Defendants' knowing, affirmative, or active concealment when they decided to purchase or lease Class Vehicles.

108. Because Defendants actively concealed, and continue to actively conceal, the defect in the Class Vehicles, they are estopped from relying on any statutes of limitations defense.

**Estoppel**

109. Chrysler and Grammer were, and are, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the AHR placed in the headrests installed in the Class Vehicles. Instead, they actively concealed the true character, quality, and nature of the AHR and knowingly made misrepresentations about the quality, reliability, safety characteristics, and performance of the AHR.

110. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and active concealment and omissions of material facts. Therefore, Defendants are estopped from relying on any defense based on statutes of limitations in this action.

## V. CLASS ALLEGATIONS

**Class Definitions**

111. Plaintiffs bring this action on their own behalf, and on behalf of all persons similarly situated, pursuant to Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Plaintiffs seek to certify the following proposed nationwide class and state subclasses:

 ***The Nationwide Class (Excluding California)*:**

All persons in the United States (excluding the State of California) who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Chrysler, or any of its subsidiaries or affiliates, which are equipped with headrests containing the defective AHR.

*The Louisiana Subclass:*

Plaintiffs Dantoni and Carroll allege state wide class action on behalf of:

All persons in Louisiana who currently own or lease, or who have owned or leased one or more vehicles manufactured by Chrysler, or any of its subsidiaries or affiliates, that are installed with headrest containing the defective AHR.

112. Excluded from each class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded are claims for any personal physical injuries related to the AHR defect.

113. Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

114. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**Numerosity**

115. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are hundreds of thousands of Class Vehicles nationwide equipped with headrests that have the defective AHR, including thousands in Florida. Individual joinder of all Class members is impracticable.

116. The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Chrysler's or their agents' and dealerships' books and records, as well as state vehicle registrations and sales records. Plaintiffs anticipate providing appropriate notice to each certified class in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Commonality**

117. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual Class members. The predominating common or Class-wide fact questions include, without limitation:

a. Whether the inferior plastic that Grammer used in the AHR could withstand the force of the springs under normal operating conditions;

b. Whether Defendants knew that the inferior plastic could not withstand the force of the springs under normal operating conditions;

c. Whether there were other commercially viable plastic options to use in the manufacture of the AHR;

d. Whether Defendants knowingly failed to disclose and warn U.S. consumers of the defect in the AHR;

e. Whether Defendants had a duty to disclose to U.S. consumers material facts relating to the defect in the AHR and the safety risk it presents;

f. Whether the headrest installed by Chrysler in the Class Vehicles is defective and a safety risk due to a defective AHR;

g. Whether the owner's manuals provided by Chrysler to consumers who purchased Class Vehicles sufficiently warns owners about the safety risk associated with the AHR;

h. Whether the Class Vehicles have suffered diminution of value as a result of containing headrests with the defective AHR;

i. Whether Chrysler's marketing of Class Vehicles was likely to deceive or mislead consumers;

j. Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by failing to disclose that the headrests installed in Class Vehicles have defective AHR;

k. Whether a reasonable consumer likely would be misled by Defendants conduct;

l. Whether Chrysler's conduct as alleged in this action, including the sale of the Class Vehicles installed with the defective AHR, constitutes a breach of applicable warranties;

m. Whether Plaintiffs and the Class members suffered damages as a result of Chrysler's refusal to replace the headrests or repair Class Vehicles after the AHR deploys due to the defect; and

n. Whether damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

**Typicality**

118. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Chrysler and Grammer. Each Class member purchased or leased a Class Vehicle with a defective AHR installed in the headrests and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiffs. The relief Plaintiffs seek in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

119. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are committed to the vigorous prosecution of this action and there is no hostility or conflict between

or among Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

120. To prosecute this case, Plaintiffs have chosen the undersigned law firm, who have substantial experience in the prosecution of large and complex class action litigation and have the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

121. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who own the affected Class Vehicles.

122. Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions.  The burden imposed on the judicial system by individual litigation, and to the Defendants, by even a small fraction of the Class Members, would be enormous.

123.  In comparison to piecemeal litigation, class action litigation presents far fewer  management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized

litigation. Class adjudication is simply superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).

124. Plaintiffs are unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; utilize the provisions of Fed. R. Civ. P. 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Fed. R. Civ. P. 23(c)(5) to divide any Class into subclasses.

 **Requirements of Fed. R. Civ. P. 23(b)(2)**

125. Chrysler and Grammer have acted or failed to act in a manner generally applicable to the Class members in the Nationwide Class and the Florida, New York, and Arizona Subclasses, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all of the classes.

## VI. CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES ACT
### ("LUPPA"), Lousiana Revised Statute 51:1405, *et seq.*
### against Defendant Chrysler
### on behalf of Plaintiffs DANTONI AND CARROLL and the Louisiana Subclass

126. The Louisiana Plaintiffs incorporate by reference paragraphs 1 through 140 as though fully set forth herein.

127. The Louisiana Plaintiffs and the Louisiana Subclass members are "consumer[s]" engaged in "trade or commerce" within the meaning of "LUTPA". Louisiana Revised Statute 51:1405 A., et seq.

128. Chrysler engages in "trade or commerce" within the meaning of LUPPA Revised

129. LUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

130. Chrysler engaged in unfair and deceptive trade practices including but not limited to the following:

a. Chrysler represented that the Class Vehicles have safety characteristics that they do not have;

b. Chrysler represented that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

c. Chrysler knew of the inferior plastic used in the AHR and that it fails under normal use but failed to disclose the existence of this defect to consumers or NHTSA. Chrysler knew that such information was material to consumer transactions and vehicle safety;

d. Chrysler actively concealed and misrepresented the true nature of the AHR defect; and

e. Chrysler intended for the Louisiana Plaintiffs and Louisiana class members to rely on their misrepresentations and omissions so that the Louisiana Plaintiffs and Louisiana class members would purchase or lease Class Vehicles.

131. Chrysler's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the defective AHR, had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including the Louisiana  Plaintiffs and the Louisiana Subclass members, about the safety

and reliability of Class Vehicles; the quality of the Chrysler brand; and the true value of the Class Vehicles.

132. Chrysler intentionally and knowingly misrepresented or omitted material facts regarding the Class Vehicles and the defective AHR installed in the headrests with an intent to mislead the Louisiana Plaintiffs and the Louisiana class members.

133. Chrysler knew or should have known that its conduct violated the FDUTPA.

134. The Louisiana Plaintiffs and Louisiana class members were and are injured as a result of Chrysler's conduct because the Louisiana  Plaintiffs and Louisiana class members paid to own or lease a Class Vehicle without a safety defect in the headrests and instead received and overpaid for a vehicle containing the defective AHR.

135. Chrysler's failure to disclose, and active concealment of, the defective AHR system and the dangers and risks it posed were material to the Louisiana Plaintiffs and the Louisiana class members. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

136. The Louisiana Plaintiffs and the Louisiana class members have suffered ascertainable losses as a result of Chrysler's misrepresentations and failure to disclose information about the defective AHR. Had they been aware of the defect that existed in the headrests in Class Vehicles, Louisiana Plaintiffs and Louisiana class members either would have paid less for their vehicles or would not have purchased or leased their vehicles.  The Louisiana Plaintiffs and Louisiana class.

137. As a direct and proximate result of Chrysler's violations of LUPTA, the Louisiana Plaintiffs and the Louisiana class members have suffered injury-in-fact and actual damages.

138. The Louisiana Plaintiffs and the Louisiana Subclass members are entitled to recover their actual damages and attorneys' fees.

139. The Louisiana Plaintiffs and the Louisiana class members have suffered and will continue to suffer irreparable harm if Chrysler continues to engage in such deceptive, unfair, and unreasonable practices.

140. The Louisiana Plaintiffs, on behalf of the Louisiana class members, request that the Court award them actual damages and issue an order requiring Chrysler to notify the Louisiana class members of the defect and repair or replace the defective AHR as well as award the Louisiana Plaintiffs' and Louisiana class members' attorneys' fees; and any other just and proper relief available under **LUPTA.**

**COUNT II**
**FRAUD BY CONCEALMENT**
**against Defendant Chrysler**
**on behalf of Plaintiffs Dantoni and Carroll**
**and all class members**

141. Plaintiffs Dantoni and Carroll re-allege and incorporate by reference paragraphs 1 through 140 as if fully set forth herein and further allege as follows.

142. Plaintiffs bring this claim on behalf of all Class members under the common law of fraudulent concealment, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, Plaintiffs bring this claim against Chrysler under the laws of the states where Plaintiffs and Class members purchased their vehicles.

143. Chrysler concealed and suppressed material facts concerning the defective AHRs installed in the headrests, namely that they are, in fact, made with a cheap inferior plastic and prone to cracking, breaking, and deploying without warning; that this defect causes the AHR to deploy without the vehicle being involved in a rear-end collision; and that this defect poses a threat of serious injury to occupants. Chrysler knew these representations and omissions were false when made.

144. Chrysler had a duty to disclose the defect because it is a safety-related defect which gives rise to an unreasonable risk and, correspondingly, a duty to disclose.

145. Additionally, as an automobile manufacturer, Chrysler has a duty to report all safety-related defects to NHTSA. NHTSA defines safety-related defects to include "[s]eats and/or seat backs that fail unexpectedly during normal use."

146. Chrysler also had a duty to disclose the defect because Chrysler possessed exclusive and superior knowledge of material facts regarding the defective AHRs which were not reasonably discoverable to Plaintiffs or the Class. Chrysler opted to use unsuitable and inferior ABS plastic for the plastic bracket in its AHR systems, despite knowing that such plastic could not withstand the pressure that would be exerted upon it during the ordinary operation of Chrysler vehicles. Chrysler also received early consumer reports about the defect, including reports to NHTSA as early as 2016, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic material data reports, aggregate warranty data from Chrysler dealerships, and repair order and parts data from dealerships, among other things. Further, as a result of reports of spontaneous deployments, Chrysler and Grammer conducted an internal investigation into the root cause of the problem.

147. Chrysler had a duty to disclose the defect because it took steps to actively conceal the defect from consumers, not only by failing to report the defect to NHTSA as required by federal law but denying that a defect existed when confronted with uncommanded deployments. Chrysler omitted information and denied the existence of defect despite knowing that the defect arose from AHR's design, and specifically from the use of inferior ABS plastic. These omitted and concealed facts were material because they directly impact the safety of the Class Vehicles as well as the price Plaintiffs and Class members would have been willing to pay for their Class Vehicles.

148. Finally, Chrysler also had a duty to disclose the defect because it undertook to represent to consumers that the Class Vehicles were reliable and safe; identify the AHR as a safety feature; and proclaim that Chrysler maintained the highest safety standards.

149. These omitted and concealed facts were material because they directly impact the safety of the Class Vehicles as well as the price Plaintiffs and Class members would have been willing to pay for their Class Vehicles.

150. Chrysler actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class members to purchase or lease the Class Vehicles at high prices, and to protect its profits and avoid a costly recall, and Chrysler did so at the expense of the safety of Plaintiffs and the Class members.

151.    Plaintiffs and the Class members were unaware of these omitted material facts and  would not have acted as they did had they known of the concealed or suppressed facts. Plaintiffs' and the Class members' actions were reasonable and justified.

152.  On information and belief, Chrysler has still not made any disclosure regarding the true problem with the defective AHR, despite having knowledge through agents at Chrysler dealerships and Chrysler service centers, among other things, that the defect is evident in vehicles.

153. Because of the concealment or suppression of the facts, Plaintiffs and the Class members  sustained damages because they did not receive the benefit of their bargain and the value of the Class Vehicles has been diminished, which is a direct result of Chrysler's wrongful conduct.

154. Chrysler's acts were done oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights and well-being to enrich itself.

Chrysler's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### COUNT III FRAUD BY CONCEALMENT
**against Defendant Grammer on behalf of Plaintiffs Dantoni and Carroll and all class members**

155.    Plaintiffs, Dantoni and Carroll Allen and all Class members re-allege and incorporate by reference paragraphs 1 through 140 as if fully set forth herein and further allege as follows:

156.  Plaintiffs bring this claim on behalf of all Class members under the common law of fraudulent concealment, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, Plaintiffs bring this claim against Grammer under the laws of the states where Plaintiffs and Class members purchased their vehicles.

157.  Grammer concealed and suppressed material facts concerning the defective AHRs installed in the headrests, namely that they are, in fact, made with inferior plastic and defective and prone to cracking, breaking, and deploying without warning; that the defect causes the AHR to deploy without the vehicle being involved in an accident; and that the defect poses a threat of serious injury to occupants.  Grammar knew these facts; knew that they were material to consumers; concealed them; and failed to disclose them.

158. Grammer had a duty to disclose the defect because it is a safety-related defect and the safety risk posed by the AHR defect—the risk of injury or death—is an unreasonable risk.

159.  Grammar also had a duty to disclose the defect because Grammer possessed exclusive and superior knowledge of material facts regarding the defective AHRs which were not reasonably discoverable to Plaintiffs or the Class. Grammer opted to use unsuitable and inferior ABS plastic for

the plastic bracket in the AHRs it manufactured for Class Vehicles, knowing that such plastic could not withstand the pressure that would be exerted upon it during the ordinary operation of the Class Vehicles. Grammer also reviewed engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, and ABS plastic material data reports, among other things. Further, as a result of reports of spontaneous deployments, Grammer and Chrysler conducted an internal investigation into the root cause of the problem.

160. Grammer actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class members to purchase or lease the Class Vehicles at high prices, to protect its role in the automotive industry supply chain, and to protect its profits and avoid a costly recall. Grammer did this at the expense of the safety of Plaintiffs and the Class members.

161. Grammer actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class members to purchase or lease the Class Vehicles at high prices, to protect its role in the automotive industry supply chain, and to protect its profits and avoid a costly recall. Grammer did this at the expense of the safety of Plaintiffs and the Class members.

162. Plaintiffs and the Class members were unaware of these omitted material facts and relied on Grammer's omissions; had they known their Chrysler vehicles included a safety defect, they would have paid less, or would not have purchased the vehicles. Plaintiffs' and the Class members' actions were reasonable and justified.

163. On information and belief, Grammer has still not made any disclosure regarding the true nature of the defective AHR, despite having knowledge of it.

164. Because of the concealment or suppression of the facts, Plaintiffs and the Class members sustained damages because they did not receive the benefit of their bargain and the value

the Class Vehiclthe Class Vehicles has been diminished. Their loss is a direct result of Grammer's wrongful conduct.

165. Grammar's acts were done oppressively, deliberately and with intent to fraud, and in reckless disregard of Plaintiffs' and the Class members' rights and well-being in order to enrich itself. Grammer's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### COUNT IV VOILATION OF THE MAGNUSON -MOSS WARRANTY ACT ("Magnuson-Moss"), 15 U.S.C. § 2301, *et seq.* against Defendant Chrysler on behalf of Plaintiffs and all Class Members

166. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 140, as though fully set forth herein.

167. Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of the written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(1) (Remedies in consumer disputes). As alleged above, Chrysler has failed to comply with the terms of its written, express, or implied warranties.

168. This Court has jurisdiction to decide claims brought under 15 U.C.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)–(d).

169. The Class Vehicles are "consumer products" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(1).

170. Plaintiffs and the Class members are "consumers" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(3).

171. Chrysler is a "supplier" and "warrantor" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(4)-(5).

172.   As a supplier and warrantor, Chrysler is obligated to afford Plaintiffs and the Class members, as consumers, all rights and remedies available under Magnuson-Moss, regardless of privity.

173.   Magnuson-Moss provides a cause of action for, among other things, any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

174.   Defendants breached their implied warranties of merchantability, which they cannot disclaim under Magnuson-Moss, *see* 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiffs and the Class members have suffered damages as a result of Chrysler's breaches of warranties as set forth above.

175.   Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

176.   Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Chrysler and the Plaintiffs and Class members.

177.   Chrysler knew that the Class Vehicles were defective and posed safety risks, and that the Class Vehicles would continue to pose safety risks after the warranties purportedly expired. Chrysler failed to disclose the defect to Plaintiffs and other Class members. Therefore, Chrysler's enforcement of any durational limitations on warranties is unlawful.

178.   Plaintiffs and Class members purchased their Class Vehicles from authorized Chrysler dealerships acting as agents of Chrysler. Plaintiffs and Class members were the intended consumer of the Class Vehicle and the AHR and the warranty was intended to benefit the consumers and not the dealerships thereby establishing privity of contract.

179.  Nonetheless,  privity is not required here because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Chrysler and its agents and dealerships, and specifically, of the implied warranties. The warranties are intended to protect end-consumers, not dealers. Dealers have no rights under the warranty agreements provided with the Class Vehicles. Further, privity is not required because the Class Vehicles are dangerous instrumentalities due to the defective AHR.

180.  Chrysler's breach of warranty has deprived Plaintiffs and other Class members of the benefit of their bargain. The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

181.  Plaintiffs and the Class members have suffered, and are entitled to recover, damages as a result of Chrysler's breach of warranty and violations of Magnuson-Moss.

182.  Chrysler had an opportunity to disclose information concerning the Class Vehicles' inability to perform as warranted, and to cure its breach of warranty. As yet, Chrysler has failed to do so.

183.  As a direct and proximate result of Chrysler's conduct, Plaintiffs and other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease that is, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.

184.  Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(1). Rescission and Revocation of Acceptance are equitable remedies available to Plaintiffs and the Class members under Magnuson- Moss.

185.   Plaintiffs also seeks under Magnuson-Moss, an award of costs and expenses, including attorneys' fees, to prevailing consumers in connection with the commencement and prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). Plaintiffs and the Class members intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

### COUNT IV VIOLATION OF THE MAGNUSON-MOS WARRANTY ACT ("Magnuson-Moss"), 15 U.S.C. § 2301, *et seq.* against Defendant Grammer on behalf of Plaintiffs and all Class Members

186.  Plaintiffs  re-allege and incorporate by reference paragraphs 1 through 140, as though fully set forth herein.

187.  Plaintiffs bring this claim on behalf of all Class Members.

188.  This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, by virtue of 28 U.S.C. § 1332(a)–(d).

189.  The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

190.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

191.   Grammer is a "supplier" and a "warrantor" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

192.  The Magnuson-Moss Warranty Act provides a cause of action for any consumer who is harmed by a warrantor's failure to comply with a written or implied warranty. 15 U.S.C. § 2310(d)(1).

193.  Grammer provided Plaintiffs and other Class members with an implied warranty of merchantability in connection with the purchase or lease of their Class Vehicles. As part of the

implied warranty of merchantability, Grammer warranted that the headrests equipped with the AHRs were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed.

194.  Grammer breached this implied warranty, as detailed above, and is therefore liable to Plaintiffs and the Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect: the AHR is made of an inadequate type of ABS plastic that fails under normal use.

195.  Any effort to limit the implied warranty in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

196.   Any limitations on the warranty are procedurally unconscionable because there was unequal bargaining power between Grammer, on one hand, and the Plaintiffs and Class members on the other.

## COUNT VI UNJUST ENRICHMENT
### against Defendant Chrysler on behalf of Plaintiffs and the Class Members

197. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 140 as though fully set forth herein.

198. Plaintiffs bring this claim on behalf of all Class members under the common law of unjust enrichment, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, Plaintiffs bring this claim against Chrysler under the laws of the states where Plaintiffs and Class members purchased their vehicles.

199. Chrysler has received and retained a benefit from the Plaintiffs and Class members and inequity has resulted.

220. Plaintiffs and the Class members directly conferred benefits on Chrysler: the price paid for the Class Vehicles advertised as having the safety feature of the AHR which was defectively designed and does not function as advertised.

221. Plaintiffs and the Class members paid their purchase prices in reliance on Chrysler's representations that the Class Vehicles were safe, fit for ordinary use, and equipped Plaintiffs bring their unjust enrichment claims against Chrysler in the alternative to their contractual claims. with the AHR that would only deploy in the case of a rear-end collision rather than at random. Plaintiffs and the Class members would not have purchased the Class Vehicles, or would have paid less, if not for these representations.

222. Chrysler benefitted through its unjust conduct by selling Class Vehicles equipped with headrests with the defective AHR at a profit and for more than the Class Vehicles were worth. Further, Chrysler has benefitted through it unjust conduct in refusing to recall and repair the defect in Class Vehicles and thus saving that cost.

223. It is inequitable for Chrysler to retain these benefits. Chrysler will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Chrysler was unjustly enriched at his or her expense.

224. Plaintiffs do not have an adequate remedy at law.

225. The amount of Chrysler's unjust enrichment should be disgorged, in an amount to be proven at trial.

226. Plaintiffs, on behalf of themselves and all similarly situated Class members, seek an award against Chrysler in the amount by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

**COUNT VII UNJUST ENRICHMENT against Defendant Chrysler
on behalf of Plaintiffs and the Class Members**

227. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 140 as though fully set forth herein.

228. Plaintiffs bring this claim on behalf of all Class members under the law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of 62 the states where Plaintiffs and Class members purchased their vehicles

229. Grammer has received and retained a benefit from the Plaintiffs and Class members and inequity has resulted.

230. Plaintiffs and the Class members overpaid for the Class Vehicles because they would not have purchased the Class Vehicles, or would have paid less, if Grammer had disclosed the defect in the AHR.

231. Grammer benefitted through its unjust conduct by selling the defective AHR to Chrysler at a profit and for more than the defective AHRs were worth. Further, Grammer has benefitted through its unjust conduct in refusing to participate in a recall of the defective AHR and thereby saving the cost of a recall.

232. It is inequitable for Grammer to retain these benefits. Grammer will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Grammer was unjustly enriched at his or her expense.

233. Plaintiffs do not have an adequate remedy at law.

234. The amount of Grammer's unjust enrichment should be disgorged, in an amount to be proven at trial.

235. Plaintiffs, on behalf of themselves and all similarly situated Class members, seek an award against Grammer in the amount by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

236. Grammer's deceptive or unfair acts or practices, including concealing, omitting, or suppressing material facts about the defective AHR, were immoral, unethical, unscrupulous, and substantially injurious to the Louisiana Plaintiffs and the Louisiana Subclass members.

237. Grammar intentionally and knowingly failed to disclose the known safety defect in the AHR installed in the headrests in order to induce the Louisiana Plaintiffs and Louisiana sub-class members to purchase Class Vehicles.

**CLAIM FOR REDHIBITION**
**BY LOUISIANA PLAINTIFFS, DANTONI AND CARROLL,**
**ON THEIR OWN BEHALF AND ON BEHALF OF**
**LOUISIANA CLASS MEMBERS**
**PURSUANT TO LA. CIVIL CODE ARTICLE 2520, et seq.**

238. The Louisiana Plaintiffs incorporate by reference paragraphs 1 through 237 as fully set forth herein. The Louisiana Plaintiffs and the Louisiana Subclass are buyers within the meaning of the La. Civ. Code Art. 2520 et. seq. Louisiana Plaintiffs allege that the defect of the AHR system was such that it has diminished the usefulness of the vehicle and it's value and had Plaintiffs known of this defect as a buyer that would not have bought the vehicle and thus the Defendants are liable for damages including rescission of sale, attorney's fees and costs.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly situated Class members, request that the Court enter judgment against Defendants as follows:

(1) Declare this action to be a proper class action maintainable under Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Plaintiffs as class  and subclass representatives and Plaintiffs' chosen counsel as Class Counsel;

(2) Declare that the AHR headrests installed in the Class Vehicles are defective;

(3) Declare that Chrysler and Grammer are financially responsible for notifying all Class members about the defective AHR, issue a recall for the AHR system, and replace, at its cost, the headrests installed in the Class Vehicles with headrests that do not have a defective AHR;

(4) Declare that the conduct of Chrysler and Grammer as alleged herein to be unlawful, unfair or deceptive and issue an order temporarily and permanently enjoining Chrysler and Grammer from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this action;

(5) Declare that Chrysler and Grammer must disgorge, for the benefit of Plaintiffs and the Class members all or part of the ill-gotten gains they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class members;

(6) Award Plaintiffs and Class members actual, compensatory, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial under the applicable claims;

(7) Award Plaintiffs and Class members their reasonable attorneys' fees and costs, as allowed by law;

(8) Award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law; and

(9) Award Plaintiffs and Class members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b) plaintiffs demand trial on any and all issues triable by a jury.

Respectfully Submitted:

/s/ Matthew B. Moreland
JIM S. HALL (#21644)
jodi@jimshall.com
MATTHEW MORLEAND (#24567)
mmoreland@jimshall.com
800 N. Causeway Blvd., Suite 100
Metairie, Louisiana 70001
Telephone: (504) 832-3000
Facsimile (504) 832-1799